In the Matter of the Estate of JOHN JAMES MONTGOMERY, Deceased.

Surrogate's Court, Kings County, February 14, 1938.

*Hunt, Hill & Betts [James E. Bennett, Jr., of counsel], for the National City Bank of New York, as executor-trustee, petitioner.*

*Frederic A. Behrens,* for Ida Lillian Montgomery, administratrix *c. t. a.* of Harry C. Montgomery, deceased, son of decedent herein.

*Caputi & Caputi [Sebastian P. Caputi of counsel], for Robert W. Montgomery and John R. Montgomery, sons and residuary distributees of decedent.*

WINGATE, S. This construction proceeding again propounds the perennial enigma as to whether or not a remainder gift following a life estate did or did not become indefeasibly vested in the remaindermen upon the death of the testator.

The residue of the estate was erected into a trust for the life benefit of the widow with the following succeeding direction: " and upon her death then the said Trust is to cease and terminate and my Trustee shall thereupon, as soon as is reasonably convenient, sell and dispose of all said property in its possession, both real and personal and from the said proceeds pay to my grandson, John Renwick Montgomery the sum of One Thousand Dollars ($1,000.00) and to my grand-daughter Lulu H. Patterson the sum of One Thousand Dollars ($1,000.00) and the remainder shall be equally divided and paid over to my sons Harry C. Montgomery, Robert Walker Montgomery and John Renwick Montgomery, *or their survivors.* Provided, however, that should either my grandson John Renwick Montgomery, or my granddaughter Lulu H. Patterson die before me then I give and bequeath their portion above mentioned, namely $1,000.00 each, to their issue, if any,— otherwise the bequest is to lapse and be added to the portion to be received by my sons." (Italics not in original.)

. At the time of the execution of this will, and when he died, the testator had three sons, Harry, Robert and John, who are the persons to whom reference is made in the foregoing excerpt. Robert and John were unmarried. Harry married twice and had two children by his first marriage, namely, John R. Montgomery and Lulu H. Patterson, who are the grandchildren contingently benefited in the directed remainder distribution.

All three sons and the two grandchildren survived the testator. Harry C. Montgomery, one of their number, has, however, since died. The life beneficiary of the trust, the widow of the testator, is still living. The concrete question is as to whether the remainder gift to Harry vested absolutely in him as of the date of death of the testator in a manner which will effect its devolution pursuant to the terms of his will upon the death of the life beneficiary of the trust.

The court notes with pleasure that in the preparation of two of the three memoranda filed, counsel have heeded the oft-repeated admonition of this and other courts respecting the utter futility and useless waste of paper involved in the practice of citing precedents interpreting the language employed by other testators in different wills, and urging their results as persuasive in the present instance. (*Matter of Watson*, 262 N. Y. 284, 297; *Matter of Rossiter*, 134 Misc. 837, 839; affd., 229 App. Div. 730; affd., 254 N. Y. 583; *Matter of Weissman*, 137 Misc. 113, 114; affd. on opinion of this court, 232 App. Div. 698; *Matter of Corlies*, 150 Misc. 596, 597, 598; affd., 242 App. Div. 703; *Matter of. Wintringham*, 161 Misc. 346, 349; *Matter of Ward*, 165 id. 949.) The language present in the two *nisi prius* adjudications upon which reliance is placed by the single brief which continues this unfortunate practice is readily distinguishable from that found in the will at bar.

Less commendable is the action of certain counsel in urging in their briefs as bases for decision, alleged facts which do not appear in the papers constituting the record upon which the determination must be predicated. This was partially cured after the submission of the case at the suggestion of the court that certain of these wholly unsubstantiated assertions of fact be made the subject of stipulation by the parties, but other uncured statements still remain, which would be potentially prejudicial to their adversaries were the court consciously or unconsciously to be influenced thereby. It is primary that judicial decisions must be predicated upon the record alone and that statements in briefs of alleged facts which are not substantiated by the record are highly improper. (*Laning v. New York Central R. R. Co.*, 49 N. Y. 521, 539; *Matter of Allen*, 148 App. Div. 26, 28; affd., 205 N. Y. 158; *Brown-Duffy Goatskin*

*Corp.* v. *Henkel*, 211 App. Div. 342, 344; *Gruhn* v. *Eppig*, 175 id. 787, 790; *Bronner* v. *Walrath*, 208 id. 758; *Matter of Mehler*, 143 Misc. 63, 64; *Matter of Morningstar*, Id. 620, 624; *Matter of Mc Keogh*, 151 id. 327, 328; *Matter of Markowitz*, 152 id. 1, 2; *Matter of Lesser*, 154 id. 364, 365; *Matter of Razoux*, Id. 477, 478; *Matter of Green*, 160 id. 490, 491.)

Excluding from consideration, therefore, undemonstrated factual assertions and irrelevant interpretations of the language of other wills, and turning to that which is often urged as a sounder basis for attaining a result, namely, the applications of canons of construction, it will be observed that in the present instance, as is so frequently the case, the employment of different canons of construction may lead to diametrically opposed results.

The turning point of the interpretation is the point of time to which the phrase " or their survivors," which has been italicized in the quoted excerpt from the will, is to be referred. In other words, the question is as to whether this phrase refers to survivorship of the testator or of the life beneficiary.

In this connection the canon of construction might become applicable that " where there is a devise to one person in fee, and in case of his death to another, the contingency referred to is the death of the first named devisee during the lifetime of the testator, and that if such devisee survives the testator, he takes an absolute fee " (*Matter of New York, L. & W. R. R. Co.*, 105 N. Y. 89, 92), or, as the principle has frequently been stated in somewhat broader terms: " Words of survivorship and gifts over on the death of the primary beneficiary are construed, unless a contrary intention appears, as relating to the death of the testator " (*Nelson* v. *Russell*, 135 N. Y. 137, 141). To similar effect see *Fowler* v. *Ingersoll* (127 N. Y. 472, 478); *Vanderzee* v. *Slingerland* (103 id. 47, 53); *Runyon* v. *Grubb* (119 App. Div. 17, 19); *Matter of Franze* (251 id. 837); *Bacon* v. *Sayre* (84 Misc. 462, 469; affd., 164 App. Div. 909; affd., 218 N. Y. 725); *Matter of McCaughin* (136 Misc. 231, 233; affd., 232 App. Div. 711); *Matter of Moores* (155 Misc. 471, 473, 474; affd., 248 App. Div. 738); *Matter of Woodruff* (135 Misc. 203, 207); *Matter of Duffy* (143 id. 421, 422); *Matter of Guenard* (149 id. 182, 183); *Matter of Perlmutter* (156 id. 571, 574); *Matter of Beckmann* (158 id. 706, 710); *Matter of Hilliard* (164 id. 677, 696). The decisions cited are but an insignificant percentage of the pronouncements of the courts enunciating this principle and any reasonably competent law clerk might multiply their number by four or forty depending on his diligence.

If research in respect of this particular canon of construction were to terminate at this point, and it were to be deemed con-

clusive of the present controversy, it would obviously result in a determination in favor of Harry's estate since the gift was to Harry and his named brothers "or their survivors" and he was one of those who survived the testator.

At this point, however, the opinion in *Fowler* v. *Ingersoll* (127 N. Y. 472) might be encountered, which (at p. 479) quotes and applies the observation made in *Vanderzee* v. *Slingerland* (103 N. Y. 47, 56) that "the tendency is to lay hold of slight circumstances in the will to vary the construction," to which reference has just been made. The doubt engendered by this danger signal is heightened by the statement in *Matter of Denton* (137 N. Y. 428, 433), quoted and applied in *Lyons* v. *Ostrander* (167 id. 135, 140), which reads: "But this rule has only a limited operation, and cannot be extended to a case where a point of time is mentioned other than the death of the testator, to which the contingency can be referred, or to a case where a life estate intervenes, or where the context of the will contains language evincing a contrary intent."

Finally, any effect of the canon, beneficial to Harry's estate, is destroyed by the statement in *Matter of Farmers' Loan & Trust Co.* (189 N. Y. 202, 207) that "Ordinarily, in providing a gift over, in case of the death without issue of a legatee, the time of death, unless a different intent appears, will be held to refer to a death occurring during the lifetime of the testator. But *where the disposition of the property which is devised over in case of death is preceded by a prior estate for life or years, then the general rule is, that the time of death refers to* that which occurs during the period of the intervening estate" (Italics not in original), and by the similar enunciation of principles in *United States Trust Co.* v. *Peters* (180 App. Div. 186, 191; affd., 224 N. Y. 626) that "where a devise of the fee of property is made to take effect in the future, upon the termination of intervening life estates, with a substantial gift to others in the event of death, the death referred to will be held to be death at any time prior to the termination of the life estates."

As a result of these decisions, the earlier *prima facie* inference of this canon in favor of Harry's estate is transformed into one adverse thereto, and if this canon is to serve as the criterion of present determination, the exception must be applied and it be held that Harry's death prior to the termination of the intervening life estate ended his rights to participation.

It might well be, however, that with pen poised for writing "finis" to a decision to this effect, the harassed *nisi prius* court would suddenly recollect the frequent statements by his judicial superiors that "The law favors the vesting of estates and a con-

struction which will prevent the disinheritance of the issue of a remainderman who may die during the existence of the precedent estate." (*Matter of Banker*, 223 App. Div. 496, 501; affd., 248 N. Y. 596.) To like effect see *Lewis v. Howe* (174 N. Y. 340, 346); *Hersee* v. *Simpson* (154 id. 496, 500, 502); *Nelson* v. *Russell* (153 id. 137, 140); *Manice v. Manice* (43 id. 303, 368); *Connelly* v. *O'Brien* (166 id. 406, 408); *Cammann* v. *Bailey* (210 id. 19, 30); *Trowbridge* v. *Coss* (126 App. Div. 679, 683); *Foote v. Peaslee* (206 id. 329, 332; affd., 237 N. Y. 586); *Matter of Rossiter* (134 Misc. 837, 840; affd., 229 App. Div. 730; affd., 254 N. Y. 583); *Matter of Leonard* (143 Misc. 172, 176); *Matter of Duffy* (Id. 421, 424); *Matter of Curlitz* (134 id. 160, 163), and that such vesting will be deemed to have taken place as soon as possible after the death of the testator. (*Matter of Chalmers*, 264 N. Y. 239, 247; *Riker* v. *Gwynne*, 201 id. 143, 149; *Bowditch* v. *Ayrault*, 138 id. 222, 228; *Whitman* v. *Terry*, 196 App. Div. 282, 287; *Williams* v. *Williams*, 152 id. 323, 325; *Matter of Milhau*, 151 Misc. 283, 289; *Matter of Cary*, 154 id. 682, 683; *Matter of Meyer*, 162 id. 426, 428.)

While still perplexed by the diverse results attainable through the media of these differing criteria of decision, the language of the Court of Appeals in *Dougherty* v. *Thompson* (167 N. Y. 472, 483), which is paraphrased and applied in *Whitman* v. *Terry* (196 App. Div. 282, 287), comes to mind. It is there said: " It is true that the law favors the vesting of legacies as early as possible, but it does so to avoid perpetuities, intestacy, illegal suspension of the power of alienation, and to effect an intent which might otherwise be defeated."

The meaning of the last clause of this statement is elusive. The primary principle of testamentary interpretation is the validization of the testamentary intent, which, if clear, will neither be defeated by any canon of construction, nor does it require any such canon for support. These principles are axiomatic.

If, therefore, this assertion of the limitation upon the applicability of the principle in favor of vesting, made by the Court of Appeals and the Appellate Division, means anything (and no respectful *nisi prius* tribunal would have the temerity to assert the contrary), it must mean that the reason for the application of the canon, in so far as it is applicable, is, as stated, to avoid perpetuities, intestacy and illegal suspension of the power of alienation. It would follow, on the principle *cessante ratione legis cessat ipsa lex* (*People* v. *Bloom*, 193 N. Y. 1, 8; *Edington* v. *Ætna Life Ins. Co.*, 77 id. 564, 571; *McCarty* v. *Terry*, 7 Lans. 236, 238) that where, as in the present case, no such potential invalidity of the will is present, the canon becomes inoperative.

Whatever the correctness of this conclusion may be, the principle respecting vesting resembles other canons of testamentary interpretation and " Like all other rules in construing wills it cannot be applied when it is found that by doing so the intention of the testator would not be carried out." (*Snyder* v. *Snyder*, 182 App. Div. 65, 71; *Matter of Meahl*, 241 id. 333, 334; *Dougherty* v. *Thompson*, 167 N. Y. 472, 483.) This statement, even in the absence of the noted limitation upon the applicability of the rule again remits the solution of the problem to the individual opinion of the court respecting the meaning of the language employed.

Examination of the decisions in *Dougherty* v. *Thompson, Whitman* v. *Terry* and others of those last cited naturally brings up for consideration the present pertinence of another familiar canon of construction, popularly designated as the " pay and divide rule."

This " rule " appears to be of very early recognition. A comparatively ancient statement of its import is found in *Smith* v. *Edwards* (88 N. Y. 92, 103) where the court observes: " Out of that distinction has grown a rule which bears directly upon the present case, that where the only gift is in the direction to pay or distribute at a future time, the case is not to be ranked with those in which the payment or distribution only is deferred, but is one in which time is of the essence of the gift. * * * In such cases, until the happening of the future event, it must necessarily remain uncertain whether a gift would exist at all, and that could not be said to have vested which was not certainly given. So far the rule is undoubtedly established, and rests upon evident and sound reason. * * * The condition of survival attached to the gift itself; who the legatees would in fact prove to be, depended upon a future contingency."

The citations and applications of this " rule " have been well nigh innumerable. A few such instances will be noted. (*Goebel* v. *Wolf*, 113 N. Y. 405, 412; *Matter of Brown*, 154 id. 313, 325; *Matter of Crane*, 164 id. 71, 76; *Herzog* v. *Title Guarantee & Trust Co.*, 177 id. 86, 99; *Lewisohn* v. *Henry*, 179 id. 352, 362; *Matter of Pulis*, 220 id. 196, 204; *Wright* v. *Wright*, 225 id. 329, 336; *May* v. *May*, 209 App. Div. 19, 21; *Matter of Newkirk*, 233 id. 168, 170; *Matter of Hopner*, 148 Misc. 748, 750; affd., on opinion of this court, 242 App. Div. 652; *Matter of Leonard*, 143 Misc. 172, 178; *Matter of Denniston*, 157 id. 80, 82.)

Several exceptions have, however, been engrafted on this rule, two of which, noted in *Matter of Crane* (164 N. Y. 71, 76, 77), are that " If the postponement of the payment is for the purpose of letting in an intermediate estate, then the interest shall be

deemed vested at the death of the testator and the class of legatees is to be determined as of that date, for futurity is not annexed to the substance of the gift," and " where there are words importing a gift in addition to the direction to executors or trustees to pay over, divide or distribute; in such a case the general rule of construction does not govern because the language employed, outside of the direction to divide or distribute, imports a gift."

Obviously neither of these exceptions is applicable to the language of the present will which directs that upon the death of the life beneficiary the trust shall cease, its assets shall be converted, $2,000 shall be paid to the grandchildren " and the remainder shall be equally *divided and paid over* to my sons * * * or their survivors." (Italics not in original.)

If, therefore, this canon of construction is to be deemed to govern the distribution, it must follow that any interest which Harry possessed was divested by his death prior to the time appointed for the division and payment, and his estate may receive nothing.

It has, however, been indicated with considerable frequency that this principle is to be applied only as an ultimate expedient and when doubt as to the intended disposition may not otherwise be resolved (*Fulton Trust Co.* v. *Phillips*, 218 N. Y. 573, 583; *U. S. Trust Co.* v. *Taylor*, 193 App. Div. 153, 157; affd., 232 N. Y. 609. See, also, *Matter of Crane*, 164 id. 71, 77; *Matter of Hilliard*, 164 Misc. 677, 695; *Matter of Green*, 160 id. 490, 493; *Matter of Beckmann*, 158 id. 706, 709; *Matter of Soy*, 143 id. 217, 219), and an examination of the decisions in which this canon was potentially available as a basis of determination and was discarded or not followed indicates the substance of its indictment by Chief Judge CULLEN (*Dickerson* v. *Sheehy*, 209 N. Y. 592), " that it is a rule more honored in the breach than in the observance." (See, *e. g.*, *Matter of Gardner*, 140 N. Y. 122, 129; *Campbell* v. *Stokes*, 142 id. 23, 29; *Matter of Tompkins*, 154 id. 634, 644; *Haug* v. *Schumacher*, 166 id. 506, 517; *Roosa* v. *Harrington*, 171 id. 341, 355; *Fulton Trust Co.* v. *Phillips*, 218 id. 573, 582.) In this situation, this canon sheds but a feeble light by which the footsteps of the court may be guided.

A canon of interpretation of somewhat more general acceptance, defined in *Wood* v. *Mitcham* (92 N. Y. 375, 379, 380), is that " where a will is capable of two interpretations, that one should be adopted which prefers those of the blood of the testator to strangers." This principle, the same authority says, " can be overcome only by clear and unequivocal language." The reiterations of this principle are almost innumerable. (See, *e. g.*, *Matter of Rooker*, 248 N. Y. 361, 364; *Quinn* v. *Hardenbrook*, 54 id. 83, 86; *Matter of Werlich*,

230 id. 516, 520; *Matter of Pettit*, 241 App. Div. 209, 212; *Matter of Weil*, 151 Misc. 841, 850; affd., 245 App. Div. 822; *Matter of Hopner*, 148 Misc. 748, 751, 752; affd. on opinion of this court, 242 App. Div. 652; *Matter of Myers*, 137 Misc. 868, 872; *Matter of Curlitz*, 134 id. 160, 163; *Matter of Loglier*, 159 id. 194, 197.)

Here, at least, there is, obviously, a sounder basis for a rule of imputed intention than is discernible in those hereinbefore considered whose reason is founded only on policy of law or the choice of phraseology by the particular scrivener, since there is a natural inference from customary human conduct that a person will desire to confer a benefit upon those most closely related to him rather than upon strangers.

Unfortunately, in the present instance there is no sure indication as to which of the possible alternatives of interpretation would produce this result, since the terms of Harry's will have not been disclosed. If it left his entire estate to his children, it might be argued that either interpretation would benefit the blood relatives of the present testator in equal measure whereas if his chief beneficiary was his second wife, as is inferable from her intense interest in the outcome of this litigation, the contrary would be the fact.

The final canon of construction which might conceivably possess present pertinence is stated in *Matter of Harden* (177 App. Div. 831, 835; affd., 221 N. Y. 643) as follows: " It is a general rule with respect to the construction of wills that if a will is susceptible of two constructions, one of which will tend to inequality in the distribution of the estate between the children of the testator, and the other will tend to produce equality, the latter construction is favored." (See, also, *Soper v. Brown*, 136 N. Y. 244, 248; *Stokes v. Weston*, 142 id. 433, 439; *Matter of Knight*, 196 App. Div. 355, 358; *Chase Nat. Bank v. Chicago Title & Trust Co.*, 155 Misc. 61, 75; affd., 246 App. Div. 201; affd., 271 N. Y. 602; *Matter of Corlies*, 150 Misc. 596, 601; affd., 242 App. Div. 703; *Matter of Andrews*, 133 Misc. 365, 367; *Matter of Berbling*, 134 id. 730, 732; *Matter of Balsamo*, 136 id. 113, 115, 116; *Matter of Gebhardt*, 139 id. 775, 779; *Matter of Grefe*, 140 id. 134, 138; *Matter of Schrier*, 145 id. 593, 597, 598; *Matter of Stulman*, 146 id. 861, 878; *Matter of Milhau*, 151 id. 283, 291; *Matter of Stutzer*, 156 id. 684, 687.)

In the last analysis, this appears to be merely another application of the principle that such interpretation should be given to a will as has " in its favor the balance of reasons and probabilities." (*Weeks v. Cornwell*, 104 N. Y. 325, 336; *Robinson v. Martin*, 200 id. 159, 164.) Since, therefore, statutory distribution in intestacy is based on the theoretical desire of the average individual respecting the disposition of his property (*Matter of Weiss-*

*man,* 137 Misc. 113, 116; affd. on opinion below, 232 App. Div. 698; *Matter of Smallman,* 141 Misc. 796, 798; *Matter of Shupack,* 158 id. 873, 877; *Matter of Williams,* 162 id. 507, 509; *Matter of Anonymous,* 165 id. 62, 63), the interpretation placed upon this canon favoring equality in *Matter of Pettit* (241 App. Div. 209, 211. See, also, *Matter of Jarvis,* 152 Misc. 252, 261, 262), as implying conformity to the general laws of inheritance by family groups, would seem to be theoretically correct.

If it be so interpreted, it is obviously presently inapplicable, by reason of the gifts in the remainder direction to Harry's children. A determination, therefore, that Harry's estate was entitled to receive one-third of the balance in addition, would give his branch of the family more than either of the others, whereas a contrary decision would give them less. The canon favoring equality would be violated in either case.

The result of the foregoing analysis of the five canons of construction potentially applicable to the language of the instant will and to the facts, as disclosed, demonstrates that application of the usual statement of the rule respecting reference of words of survivorship to the testator would favor a determination that Harry's gift became effective on the death of the testator, whereas application of the exception to that rule would produce a contrary result; that the statement of the canon respecting vesting would indicate that Harry's gift vested on the death of the testator, whereas the reason stated to underlie it is to the reverse; that application of the " divide and pay over " rule would defeat the claims of Harry's estate, but that this rule is of doubtful applicablity, and, on eminent authority, is " more honored in the breach than in the observance; " that the canon in favor of the blood is inapplicable because of insufficiency of demonstrated facts; and, finally, that the rule of equality will be violated whichever way decision be made. To climax this indecisiveness of the so-called guideposts to correct interpretation, all authorities agree that none of the rules of interpretation is applicable if the particular court sees (which would seem to mean, professes to see) an indication of a contrary intent in the terms of the will when read in the light of the circumstances surrounding the testator at the time of its execution.

It must be apparent from this review, unfortunate as such a conclusion may be, that the art of testamentary interpretation is very far from an exact science and that the particular result attained in a given case will largely be determined by the individual predelictions or prejudices of the particular perplexed judicial officer who may be called upon to pass judgment on the

question. This, in turn, like other human expressions of opinion will, no doubt, be influenced on occasion by his immediately preceding post-prandial activities and his matutinal repast.

It is even conceivable that in some minds a suspicion may arise, unjust as this might be, that the vaunted canons of construction are, in some instances at least, rather apologetics for a determination already reached than *rationes decidendi* for one in process of attainment.

In last analysis, therefore, there would seem to be no alternative for a court faced by the necessity of interpreting the terms of a will than to attempt to place himself in the arm chair of the testator in question (*Boyes* v. *Cook*, L. R. [1880] 14 Ch. Div. 53; *Fell* v. *McCready*, 236 App. Div. 390, 406), and, with the background of the disclosed facts respecting his situation, to attempt to determine what he, himself, if in a like situation, would have desired to effect by the language used in the will.

In view of the manner of submission of the present case, considerable diligence in detection by the court has been required to enable it to obtain even an approximate conception of the pertinent facts surrounding the testator at the time he executed the document. The clues followed are contained in the will, in the allegations of the account, in the objections and finally in the meagre statement of stipulated facts. As thus adduced and deduced, they present the following picture.

On May 10, 1932, when the will was executed, the testator was married. In addition to his wife, his family consisted of three sons, two of whom were unmarried and the third of whom had married and had two children, one at least of whom, by reason of her designation in her married name, was presumably an adult. Testator also had a married sister, Mrs. James McClenahan. The marital status on that day of the only son who had married, namely, Harry, is not disclosed. His first wife and the mother of his children was Clara Louise Montgomery, to whom the testator refers in the second item of his will as "my daughter-in-law." Whether her marriage to Harry had then been dissolved is not disclosed and, in the opinion of the court, is quite immaterial in any case. She certainly survived both the testator and Harry and is inferentially still alive as she was cited in this proceeding on December 30, 1937.

In any event, at some undisclosed time either before or after the execution of the will, Harry and his first wife were divorced and he married Ida Lillian Montgomery, by whom he had no children and who is his surviving widow.

The ties of blood and family appear to have possessed a strong appeal for the testator, since he gave no testamentary recognition to any other named person. Furthermore, the members of his immediate family appear to have enjoyed his preferred interest since the only gift made to any other person was the insignificant item of $300 and interest accumulations contained in a savings account which he had opened and maintained for the benefit of his sister.

His first thought was for his wife, to whom he gave an outright legacy of $3,000 and the life use of his entire estate with the significant exception of a $3,000 bequest to Harry's first wife and the unimportant gift of the little bank account to his sister. The inferences deducible from the gift to Harry's first wife will be reserved for later discussion.

Having made such provision as his circumstances might permit for his wife, the natural thought of any one imbued with a strong family loyalty such as apparently influenced this testator, was concerning his other blood relatives. These were primarily his three sons. There is no indication or permissible inference deducible from disclosed facts that he preferred one over another. Presumably, therefore, it was his primary wish after provision for his wife that each of these preferred individuals should receive an equal share in his remaining estate. Their situations, however, differed, and to provide for this difference, the testator made a preferred gift on a parity with, and equal to, the outright gift to his wife, to his daughter-in-law, the existing or former wife of his son Harry, and further provided that upon the death of his own wife preferred gifts of $1,000 each should be made to Harry's two children. Presumably he felt that as a result of the making of these gifts he had adequately benefited Harry's family or those present or former members thereof whom he desired to recognize and that he was, therefore, wholly justified in directing that the balance of his estate should be paid to his three sons, " or their survivors," in equal shares. The express gift of specified sums to the members of Harry's family is in logic if not, indeed, in law a negation of a wish to confer any additional benefit upon them either absolutely or contingently, the latter of which would presumably happen, if, as has occurred, Harry predeceased the time of possessory enjoyment of his individual benefit. In the opinion of the court the testator both did and did not intend absolute statutory equality between the branches of his descendants. He did intend it so far as concerned the ultimate remainder payable to his sons living at the time of ultimate distribution, but he did not desire it, provided all three survived his wife, since he expressly

indicated the extent to which he wished the members of Harry's family to share in any event, which would have had the effect, if Harry had survived the life beneficiary, of giving his branch of the family more than the others.

The foregoing conclusions, whereas applicable to the situation of the testator whether or not Harry's marriage to Clara Louise had been terminated at the time of the execution of the will, would be further strengthened if that marriage had already come to an end at the time of the execution of the will and his new alliance with Ida Lillian had already been contracted, since in such a situation the inclusion of Clara Louise among the most favored recipients of the testator's bounty and the pointed exclusion of Ida Lillian would have carried with it a strong logical inference of a purpose on the part of the testator to exclude the latter from any participation in his assets not only by reason of the negative inference resulting from the failure to confer a benefit, but also from the gift of a preferred legacy to the discarded wife.

It is accordingly the conclusion of the court that it was not the intent of the testator to confer any benefit upon Harry unless he lived until the time for possessory enjoyment arrived, and that the remainder of the trust, after payment of the two $1,000 legacies, will be payable to those of testator's sons who may be living at the time of the widow's death.

As hereinbefore noted, several of the canons of construction appear to support this result. In frankness it may be added, however, that this interpretation would not have been varied had the contrary been the fact.

Enter decree on notice in conformity herewith.